UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| HERMAN MILLER, INC., and DESIGN WITHIN REACH, INC., | **Case No. 1:20-cv-312** |
| *Plaintiffs*, | **COMPLAINT** *for:* |
| v. | **(1) COUNTERFEITING** |
| INTERIOR ICONS (DOE 1), and DOES 2-10. | **(2) DILUTION** |
| | **(3) INFRINGEMENT** |
| *Defendants*. | **(4) FALSE ADVERTISING** |
| | **(5) UNFAIR COMPETITION** |
| | ***Jury Trial Demanded*** |

Plaintiffs Herman Miller, Inc. ("Herman Miller") and Design Within Reach, Inc. ("Design Within Reach"), by and through their attorneys, files this complaint for counterfeiting, dilution, infringement, false advertising, and unfair competition against Defendant DOE 1, doing business as Interior Icons ("Interior Icons"), and DOES 2-10.

## PARTIES

1.     Plaintiff Herman Miller, Inc. is a corporation organized and existing under the laws of the State of Michigan having a principal place of business at 855 East Main Avenue, Zeeland, Michigan 49464.

2.     Plaintiff Design Within Reach, Inc. is a wholly owned subsidiary of Herman Miller organized and existing under the laws of the State of Delaware having a principal place of business at 711 Canal St., 3rd Floor, Stamford, CT 06902.

3.     Interior Icons is DOE 1's brand name used in connection with the operation of the website www.InteriorIcons.com.  As of the time of this filing, Herman Miller is not yet able to identify DOE 1 with any greater specificity.

4.      On information and belief, DOES 2-10 are individuals or other entities affiliated with the infringing operation at www.InteriorIcons.com.  Their true identities are not yet known to Herman Miller.

## JURISDICTION AND VENUE

5.      This is an action for trademark counterfeiting, dilution, infringement, and false advertising under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and 1125(c); for unfair competition under Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903; and for trademark infringement and unfair competition under the common law.

6.      This Court has subject matter jurisdiction over the claims pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338(a) and (b), and supplemental jurisdiction over the claims arising under the statutory and common law of the State of Michigan pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.  Furthermore, there is diversity jurisdiction as to the non-federal claims pursuant to 28 U.S.C. § 1332 to the extent the DOE Defendants are diverse relative to Plaintiffs, and because Plaintiffs' damages hereunder exceed the statutory threshold.

7.      On information and belief, this Court has personal jurisdiction over Interior Icons and the DOE Defendants because Herman Miller suffers injury from infringement and unfair competition directed at Herman Miller in this District, where Herman Miller (which is also Design Within Reach's parent company) is headquartered.  This Court also has personal jurisdiction over Interior Icons and the DOE Defendants in this District because they have been engaged in large-scale marketing for and national distribution of the infringing furniture identified herein, including in the State of Michigan, and that they have done so with express knowledge and intent that the furniture would be offered for sale and sold in Michigan, that Interior Icons and the DOE

2

Defendants would derive benefit from those Michigan sales, and that Herman Miller would suffer injury in the State.

8.     Venue is proper in this District under 28 U.S.C. § 1391 (b) and (c). On information and belief, Interior Icons and the DOE Defendants have transacted business in this District, a substantial part of the events giving rise to the claims occurred in this District, and this is the District where Herman Miller (Design Within Reach's parent company) is headquartered and the harms to Herman Miller are felt.

## PART I: BACKGROUND

### Herman Miller

9.     For over a century, Herman Miller has been a leader in the highly competitive business of designing, manufacturing, distributing, and selling high-quality, design-oriented furniture.

10.     Herman Miller is renowned for its contemporary furniture designs, which have been deemed works of art and inducted into major museums across the United States, including the Museum of Modern Art and The Henry Ford Museum in Dearborn, Michigan.

11.     Herman Miller's iconic products have generated billions of dollars in sales and are widely loved by their users.

12.     Based in Zeeland, Michigan, Herman Miller manufactures all the furniture designs asserted herein in the United States pursuant to rigorous quality controls, supporting thousands of local jobs.

13.     For decades, Herman Miller has developed close working relationships with preeminent designers, who have entrusted their design legacies to Herman Miller to protect for posterity.

4832-1523-1417.4

14.     It is precisely because Herman Miller has intellectual property rights that it can protect the work of those designers, and enable designers to produce iconic works that stand the test of time.

15.     Herman Miller has long-established trademark rights in its own name, which is protected by multiple U.S. registrations.  Herein, Herman Miller is asserting infringement of U.S. Registration Nos. 733,770 and 772,411.  Copies of these Trademark Registrations are attached at **Exhibit A**.

<u>**Charles and Ray Eames**</u>

16.     Two of the most notable of Herman Miller's designers were Charles Eames and his wife, Ray Eames.

17.     The creative genius of Charles and Ray Eames manifested itself in many ways, including photography, film making, architecture, and, most significantly, furniture design.

18.     Charles and Ray Eames became world-famous furniture designers and designed many of the items that comprise Herman Miller's furniture line.  Through their work, Charles and Ray Eames became celebrities. Authors have written dozens of books about them. The United States Library of Congress organized a travelling exhibit of the Eames' works in 1999.

19.     The collaboration between Herman Miller and Charles and Ray Eames is well-known in the industry and touted heavily in Herman Miller's marketing.

20.     Herman Miller has used the "Eames" name, as well as the name "Charles Eames" and the name "Ray Eames," and has created an intentional association with these names as used in connection with its furniture, since at least 1951.

21.     On January 26, 1982, the United States Patent and Trademark Office formally memorialized the association between the EAMES name and Herman Miller when it issued to

4

Herman Miller US Trademark Registration No. 1,187,673, for the EAMES® trademark. The registration provides Herman Miller with the exclusive right to use the EAMES® designation in connection with the sale of such furniture.  A copy of the registration certificate is attached as **Exhibit B**.

22.     Herman Miller has an industry-wide reputation for manufacturing and marketing the highest-quality contemporary furniture products, including being the exclusive source in North America and elsewhere for EAMES® chairs and furniture.

### The EAMES® Aluminum Group Chairs

23.     Charles and Ray Eames designed the EAMES® Aluminum Group chairs, and Herman Miller began producing them in 1958. Herman Miller has continuously produced the chairs since then.  An example of one of the EAMES® Aluminum Group chairs of the "Thin Pad" variety is depicted below:



24.     In 1969, Charles and Ray Eames added cushions to the EAMES® Aluminum Group chairs, and Herman Miller has produced them ever since. These chairs are sold as the EAMES® Soft Pad chairs, and are part of the EAMES® Aluminum Group family.  An example of one of the EAMES® Aluminum Group Soft Pad chairs is depicted below:



25.     Depictions of the EAMES® Aluminum Group Thin Pad and Soft Pad trade dresses are attached hereto as **Exhibit C**.

26.     Among both the Soft Pad and Thin Pad chairs, Herman Miller has sold variations with and without the distinctive parallelogram armrests (discussed further below), as well as variations with taller backrests (the Executive Chair version), and some with alternative fabrics, each of which has achieved great recognition in its own right and as part of a family of related EAMES® designs.  Exhibit C illustrates these variations.

6

27.     While some of these variants have been sold in greater quantity and for a longer period of time than others, each of these designs is well-known, indeed famous, as a Herman Miller original product design, all of which are associated with one another and with Herman Miller.

28.     Herman Miller possesses trade dress rights in all of these designs, as well as registered trade dress rights in the distinctive frame with armrests.

29.     The distinctive overall look of the EAMES® Aluminum Group design carries over through all the chairs – reinforced among all of them as a family of designs – and consumers can easily recognize them as mere variants of each other, just the same as consumers would recognize different model variants of the same car.

30.     Trade dress is simply the overall visual impression of what consumers see. However, set forth below are the most salient and dominant design features that distinguish the trade dress of the EAMES® Aluminum Group Thin Pad and Soft Pad trade dresses.

31.     A dominant distinguishing feature of the EAMES® Aluminum Group Thin Pad and Soft Pad trade dress is the appearance of a single, slender rectangular slab of roughly uniform thickness, that is substantially flat across its width, and that has been curved into a rounded L-shape and suspended between two side rails, in the manner and style of the EAMES® Aluminum Group chairs.

32.     A further distinguishing feature of Herman Miller's Thin Pad trade dress appearing on many but not all of the chairs is the use of a web or chair surface with multiple narrow rectangular tufts.

33.     Yet another distinguishing feature of Herman Miller's EAMES® Aluminum Group trade dress appearing on many but not all of the chairs is the use of parallelogram-shaped armrests, with a thin and substantially uniform cross-section.  Although customers can also buy versions of

7

the chairs without armrests, the armrests have historically been sold on a significant number of the chairs, and hence became a prominent distinguishing feature.

34.     Yet another distinguishing feature of Herman Miller's EAMES® Aluminum Group chairs is the use of "scroll" edges of the seat and backrest.

35.     Yet another distinguishing feature of Herman Miller's EAMES® Aluminum Group chairs is the specific cross-bar design across the back of the upper backrest.

36.     Yet another distinguishing feature of Herman Miller's EAMES® Aluminum Group chairs is a pair of visible parallel L-shaped side rails running along substantially the full length of the backrest and seat.

37.     Another distinguishing feature of the EAMES® Aluminum Group Soft Pad trade dress is the use of 2-3 uniformly shaped rectangular backrest cushions and a single seat cushion.

38.     The most visually dominant features of the trade dress as outlined above were articulated by Herman Miller recently in *Blumenthal Distributing, Inc. v Herman Miller, Inc*., C.D. Cal. Case No. 5:14-cv-01926-JAK ("Blumenthal Case"), wherein the District Court formally adopted those articulations in a ruling at Dkt. 192 of that case.  The articulations in the Blumenthal Case not only identified the most dominant visual features of the trade dress, but also explained how infringers might combine and/or vary those features to create an infringing design that mimics the overall appearance of the EAMES® Aluminum Group Thin Pad and Soft Pad designs.

39.     Since introducing the EAMES® Aluminum Group chairs in 1958, Herman Miller has invested millions of dollars in promoting the full family of EAMES® Aluminum Group chairs.

40.     The fact that Herman Miller now sells the EAMES® Aluminum Group Thin Pad and Soft Pad chairs as part of a family of related designs reinforces the strength of the trade dress, as consumers understand the chairs to all be variations of the same design concept.  The strength

8

and fame of any one design inures to the benefit of all of them, the same way that a convertible version of a popular car builds upon the fame of the original hardtop version.

41.     The trade dress of the EAMES® Aluminum Group chairs is unique, distinctive, and non-functional, and it is not necessary for others to use this trade dress to compete in the marketplace.  The design of the EAMES® Aluminum Group chairs is based on a general concept of suspending a web of seating upholstery between two rails, but there are an infinite variety of aesthetic design configurations that could be based on that core utilitarian concept, and the Eames couple chose the particular design of the EAMES® Aluminum Group Thin Pad and Soft Pad chairs because of their aesthetic appeal and distinctiveness.

42.     The unique and distinctive look of the trade dress of the EAMES® Aluminum Group chairs identifies and distinguishes them from competitors' chairs.

43.     The consuming public and the commercial trade have come to recognize and associate the trade dress of the EAMES® Aluminum Group chairs with Herman Miller as a result of the extensive and continuous promotion and sales of chairs over the past fifty years.

44.      Herman Miller has sold hundreds of thousands of EAMES® Aluminum Group chairs, and because they are often used for communal seating (such as in conference rooms) any given chair may have been enjoyed by thousands of users over its lifetime.

45.     The EAMES® Aluminum Group chairs have also been inducted into many art museums, including the Museum of Modern Art (MoMA) in New York.

46.     The EAMES® Aluminum Group chairs are also featured ubiquitously in American media, particularly in movies and television.  In the past several years, the EAMES® Aluminum Group chairs (as well as the EAMES® Lounge Chair) have become practically synonymous with the term "mid-century modern."  The recent resurgence in popularity of mid-century modern

9

design – driven in part by the cultural effect of the popular television show "Mad Men" – created a surge of renewed interest in the EAMES® Lounge Chairs and EAMES® Aluminum Group chairs.  That wave of renewed interest has also encouraged blatant infringement of the kind complained of in this civil action.

47.    Over the years, Herman Miller has pursued and shut down numerous infringing sales operations.  The most recent example of this is the Blumenthal Case, in which a Final Judgment of infringement and dilution was entered with respect to copies of the EAMES® Aluminum Group chairs following a jury trial.

48.    EAMES® Aluminum Group chairs are recognized as "iconic" in the marketplace.

49.    Herman Miller deliberately does not license the EAMES® Aluminum Group designs, and maintains strict control over their manufacture and sale to preserve the Eames design legacy in perpetuity.

50.    With respect to Herman Miler's trade dress rights, it is not necessary that consumers know the name of a product, or that the name of the brand owner is Herman Miller.  Rather, relevant consumers need only have a belief that the design is distinctive and originates from a single source.

51.    As a result of Herman Miller's efforts, and unsolicited media attention, the trade dress of the EAMES® Aluminum Group chairs has acquired appreciable secondary meaning, and is indeed a famous design mark, which identifies and distinguishes the chairs from chairs offered by competitors.

52.    The United States Patent and Trademark Office recognized Herman Miller's exclusive, proprietary rights in the EAMES® Aluminum Group chairs on June 20, 2006 when it issued to Herman Miller US TM Registration No. 3,105,591, covering the shape of the frame

4832-1523-1417.4

common to many of the EAMES® Aluminum Group Thin Pad and Soft Pad chairs, as depicted below:



53.      US TM Registration No. 3,105,591 is now incontestable.  The registration provides Herman Miller with the exclusive right to use the design of the EAMES® Aluminum Group chairs in connection with furniture.  A copy of the registration certificate is attached as **Exhibit D**.

54.      Registration of the EAMES® Aluminum Group Trade Dress confirms that Herman Miller owns the exclusive right to market and sell products bearing this design or any other design that is sufficiently similar thereto as to be likely to cause confusion, regardless of possible differences.

55.      As reflected by the registration, the claimed chair frame itself is sufficiently recognizable to consumers so as to be trade dress in its own right, separate and apart from the rest of the chair, much like a car's front grill shape can be protectable in its own right separate from the rest of the car.

56.     As with all of Herman Miller's trade dress registrations, registration of the EAMES® Aluminum Group Trade Dress gives notice to the world that this design belongs exclusively to Herman Miller.

57.     Registration of the EAMES® Aluminum Group Trade Dress confirms as well that the design possesses secondary meaning, shifting to anyone wishing to challenge the design the burden to prove otherwise.

58.     Registration of the EAMES® Aluminum Group Trade Dress confirms as well that the design is not functional, shifting to anyone wishing to challenge the design the burden to prove otherwise.

59.     As a result of Herman Miller's efforts, and unsolicited media attention, the registered EAMES® Aluminum Group trade dress has developed appreciable secondary meaning and fame as an indicator that Herman Miller is the source of goods.

60.     Herman Miller's registered and unregistered trade dress for the EAMES® Aluminum Group chairs represents highly valuable goodwill owned by Herman Miller.

61.     In addition to the trade dress, Herman Miller owns unregistered trademark rights in the name ALUMINUM GROUP, which it uses to market its EAMES® Aluminum Group chairs. The ALUMINUM GROUP mark has been used by Herman Miller consistently in promotion and sale of the EAMES® Aluminum Group line, and has become a well-known identifier of source for all the same reasons as the trade dress.

62.     Furthermore, Herman Miller owns unregistered trademark rights in the names of particular EAMES® Aluminum Group chairs. Rather than use model number designations, Herman Miller made a deliberate choice to call its individual chairs by name.  This includes the EAMES® Aluminum Group MANAGEMENT CHAIR (which is the version of the chair with

armrests and a medium height backrest), the EAMES® Aluminum Group EXECUTIVE CHAIR (which is the version of the chair with armrests and a tall backrest), the EAMES® Aluminum Group THIN PAD (which refers to the chairs with the thinner tufted upholstery), and the EAMES® Aluminum Group SOFT PAD (which refers to the chairs with the thicker cushions). The ALUMINUM GROUP MANAGEMENT CHAIR mark, the ALUMINUM GROUP EXECUTIVE CHAIR mark, the SOFT PAD mark, and the THIN PAD mark, have been used by Herman Miller consistently in promotion and sale of the EAMES® Aluminum Group line, and have become well-known identifiers of source for all the same reasons as the trade dress.

### The EAMES® Lounge Chair and Ottoman

63.     Charles and Ray Eames designed the EAMES® Lounge Chair in the early 1950s. Herman Miller began producing the product in 1956 and has continuously produced the chairs since then.

64.     An example of the EAMES® Lounge chair (with accompanying ottoman) is depicted below:

13



65. Further depictions of the asserted EAMES® Lounge Chair trade dress are attached hereto as **Exhibit E**.

66. The trade dress of the EAMES® Lounge Chairs is simply the overall visual appearance of the chairs as seen by consumers.

67. Although the trade dress of the EAMES® Lounge Chairs is is simply the overall visual appearance of the chairs, dominant distinguishing features as seen by consumers include the unique curvatures of both the seat and back portions; the two-part backrest design; the deeply indented "twin-button" tufting pattern on matching cushions; and the sweeping integration of the armrests into the base of the chair. Pairing the char with its matching ottomon (which bears the same twin-button tufting as the seat) only further emphasizes the association of the chair with Herman Miller because of how frequently the pair are sold together.

68. The trade dress of the EAMES® Lounge Chair is unique, distinctive, and non-functional, and it is not necessary for others to use this trade dress to compete in the marketplace.

14

Indeed, there are many other plywood and leather lounge chairs on the market that provide equivalent functionalities while having a distinctly different aesthetic.

69.     The unique and distinctive look of the trade dress of the EAMES® Lounge Chair identifies and distinguishes them from competitors' chairs.

70.     The consuming public and the commercial trade have come to recognize and associate the trade dress of the EAMES® Lounge Chair with Herman Miller as a result of the extensive and continuous promotion and sales of chairs over the past fifty years.

71.     Hundreds of thousands of EAMES® Lounge Chairs have been sold.  EAMES® Lounge Chairs are often kept as living room or office furniture, and as such are seen and enjoyed by countless more individuals than just their owners.

72.     The EAMES® Lounge Chair design has also been inducted into many art museums, including the Museum of Modern Art (MoMA) in New York.

73.     The EAMES® Lounge Chairs are also featured ubiquitously in American media, particularly in movies and television.  In the past several years, EAMES® Lounge Chairs (as well as the EAMES® Aluminum Group chairs) have become practically synonymous with the term "mid-century modern."  The recent resurgence in popularity of mid-century modern design – driven in part by the cultural effect of the popular television show "Mad Men" – created a surge of renewed interest in the EAMES® Lounge Chairs and EAMES® Aluminum Group chairs.  That wave of renewed interest has also encouraged blatant infringement of the kind complained of in this civil action.

74.     Over the years, Herman Miller has pursued and shut down many infringing sales operations.

75.     EAMES® Lounge Chairs are recognized as "iconic" in the marketplace.

4832-1523-1417.4

76.     Herman Miller deliberately does not license the EAMES® Lounge Chair or Ottoman designs, and maintains strict control over their manufacture and sale to preserve the Eames design legacy in perpetuity.

77.     With respect to Herman Miler's trade dress rights, it is not necessary that consumers know the name of a product, or that the name of the brand owner is Herman Miller.  Rather, relevant consumers need only have a belief that the design is distinctive and originates from a single source.

78.     As a result of Herman Miller's efforts, and unsolicited media attention, the trade dress of the EAMES® Lounge Chair has acquired appreciable secondary meaning, and is indeed a famous design mark, which identifies and distinguishes the chairs from chairs offered by competitors.

79.     The United States Patent and Trademark Office recognized Herman Miller's exclusive, proprietary rights to the EAMES® Lounge Chair on May 20, 2003 when it issued to Herman Miller US TM Registration No. 2,716,843 covering the shape of EAMES® Lounge Chair (without an ottoman), as depicted below:



80.     US TM Registration No. 2,716,843 is now incontestable.  The registration provides Herman Miller with the exclusive right to use the design of the EAMES® Lounge Chair chairs in connection with furniture.  A copy of the registration certificate is attached as **Exhibit F**.

81.     The United States Patent and Trademark Office also has granted Herman Miller Registration No. 5,767,140 in the design of the EAMES® Lounge Chair Ottoman, as depicted below.  A copy of the registration certificate is attached within **Exhibit F**.



4832-1523-1417.4

82.    As with all of Herman Miller's trade dress registrations, registration of the EAMES® Lounge Chair Trade Dress (both the chair and ottoman) gives notice to the world that these design belongs exclusively to Herman Miller.

83.    Registration of the EAMES® Lounge Chair Trade Dress confirms as well that the designs possesses secondary meaning, shifting to anyone wishing to challenge the design the burden to prove otherwise.

84.    Registration of the EAMES® Lounge Chair Trade Dress confirms as well that the designs are not functional, shifting to anyone wishing to challenge the design the burden to prove otherwise.

85.    As a result of Herman Miller's efforts, and unsolicited media attention, the registered EAMES® Lounge Chair and Ottoman trade dress has developed appreciable secondary meaning and fame as an indicator that Herman Miller is the source of goods.

86.    Herman Miller's registered and unregistered trade dress for the EAMES® Lounge Chair and Ottoman represents highly valuable goodwill owned by Herman Miller.

87.    Herman Miller also owns unregistered trademark rights in the name EAMES LOUNGE CHAIR as well as EAMES LOUNGE CHAIR AND OTTOMAN, which it has used consistently for decades to identify the chairs in commerce, and which are well-known for all the same reasons that the trade dress is well-known.

## The Nelson Bubble Lamps

88.    George Nelson was yet another famed American designer who was affiliated with Herman Miller, and whose furniture design legacy is cared for by Herman Miller.

89.    The popular Nelson Bubble Lamps were introduced in the 1950s, and are still popular today.

90.     Herman Miller has registered trade dress rights in several versions of the Nelson Bubble Lamps, and claims unregistered trade dress rights in other versions, which are all recognizable as part of the same family of designs.  Indeed, that is how Herman Miller markets the lamps: using the word "family," and often depicting them in groups and clusters of varying designs, as they are commonly used.

91.     Images of the "*Ball,*" "*CrissCross Ball,*" and "*Pear*" unregistered trade dress are shown below.





92.     The trade dress of the Nelson Bubble Lamps is simply their overall visual appearance to consumers.

93.     Although the trade dress is the overall visual appearance, the most salient distinguishing design elements of the Nelson Bubble Lamps at issue are their pristine white color, series of relatively closely-spaced, thin, vertical wire forms protruding through the homogenous white surface, a flattened top and bottom, and a profile that is narrower at the top and bottom while bulging out at the middle.

94.     As with any trade dress, even if an infringer varied some of the elements to some degree, the end product might still infringe if its overall impression and effect on a consumer was to evoke the original brand.

95.     The trade dress of the Nelson Bubble Lamps is unique, distinctive, and non-functional, and it is not necessary for others to use this trade dress to compete in the marketplace. The Nelson Bubble Lamp designs are intentionally aesthetic and abstract.

20

96. The unique and distinctive look of the trade dress of the Nelson Bubble Lamps identifies and distinguishes them from competitors' products.

97. The consuming public and the commercial trade have come to recognize and associate the trade dress of the Nelson Bubble Lamps as being distinctive as a result of the extensive, continuous, and consistent promotion and sales of the lamps over the past seventy years.

98. A great number of Nelson Bubble Lamps have been sold since the designs were first introduced. Nelson Bubble Lamps are often displayed in communal or public settings, and as such are seen and enjoyed by countless more individuals than just their owners.

99. The Nelson Bubble Lamps have become "iconic" in the marketplace.

100. As a result of Herman Miller's efforts, and unsolicited media attention, the trade dress of the Nelson Bubble Lamps has acquired appreciable secondary meaning, and is indeed a famous design mark, which identifies and distinguishes the tables from furniture offered by competitors.

101. Herman Miller's unregistered trade dress for the Nelson Bubble Lamps represents highly valuable goodwill owned by Herman Miller.

102. With respect to the trade dress rights, it is not necessary that consumers know the name of a product, or that the name of the manufacturer is Herman Miller. Rather, relevant consumers need only have a belief that the design is distinctive and originates from a single source.

103. Herman Miller also claims trademark rights in the various names of the Nelson Bubble Lamps.

104. BUBBLE LAMPS is Herman Miller's Registered Trademark (by assignment) No. 2,941,595, a copy of which is attached at **Exhibit G**. The mark is sometimes interlineated with the particular name of the shape of the lamp, or with "Nelson," such as "Nelson Bubble Ball

Lamp," or "Bubble Ball Lamp."  To the extent not covered by its registration, Herman Miller claims unregistered trademark rights in all iterations of the names of its Nelson Bubble Lamps.

105.    CRISS CROSS is Herman Miller's Registered Trademark (by assignment) No. 4,000,980, a copy of which is attached within **Exhibit G.**

106.    PEAR is Herman Miller's Registered Trademark (by assignment) No. 4,894,474, a copy of which is attached at **Exhibit G**.

107.    Herman Miller claims unregistered trademark rights in the name BALL as used in conjunction with Nelson Bubble Lamps.

108.    For the same reasons that the trade dress has become well-known, so too are these foregoing trade names, which identify the products in commerce, and indicate that they originate from a particular brand.

### **Design Within Reach**

109.    Founded in 1998, Design Within Reach established a unique retail outlet, and retail catalog for consumers to easily buy high quality brand designs from companies like Herman Miller and Knoll without having to use middlemen or wait for product to be manufactured and shipped. To do this, Design Within Reach established direct close connections with the major designer furniture manufacturers, and entered into agreements with them to preserve their brands.

110.    Herman Miller recently acquired Design Within Reach, which is now a wholly-owned subsidiary of Herman Miller, though Design Within Reach still also sells original product from other designer/manufacturers such as Knoll.

111.    Design Within Reach has an extensive online presence with a large website from which consumers can directly purchase branded furniture for delivery.

4832-1523-1417.4

112.    Design Within Reach also conducts an extensive catalog business, by which consumers can purchase branded furniture for delivery.

113.    Design Within Reach has also recently begun serving commercial contract purchasers.

114.    Design Within Reach actively works to preserve the brand integrity of its suppliers, with whom it is under contract as a licensee of their various trademarks and trade dress.

115.    Design Within Reach conducts business and is known both by the full name and trademark DESIGN WITHIN REACH and the initials, DWR.

116.    Design Within Reach is the owner of the registered trademark DESIGN WITHIN REACH®, which is covered by U.S. Registration Nos. 2,493,177 and 3,279,622.  Copies of these Trademark Registrations are attached at **Exhibit H.**

117.    The trademark DESIGN WITHIN REACH® has come to represent great goodwill owned exclusively by Design Within Reach.

118.    Design within reach is also the owner of the registered trademark DWR®, which is covered by U.S. Registration No. 2,894,767, also included in **Exhibit H**.

119.    The trademark DWR® has come to represent great goodwill owned exclusively by Design Within Reach.

## PART II: INTERIOR ICONS' WRONGFUL CONDUCT

120.    On information and belief, the domain www.InteriorIcons.com was created on October 30, 2007, and was originally owned by the UK company Linburn Technology Limited ("Linburn").

121.    On information and belief, Linburn is principally managed by UK citizen Neil Mitchinson, who also manages related entities in the UK.

122.    On information and belief, Linburn operated the Interior Icons website as a clearinghouse for furniture designs that deliberately and slavishly copied some of the most iconic products sold by Herman Miller, as well as other brands like Knoll.  Linburn aggressively marketed its products as literal copies of the originals, and liberally used the names and likeness of famous designers like Charles Eames to promote its products.  Linburn also boasted of having its own manufacturing operation.

123.    Herman Miller does not yet know the extent of any business that Linburn did with the United States, although on information and belief, Linburn conducted significant business at least in the UK, with Mr. Mitchinson being personally involved in sales and promotional activities.

124.    On information and belief, in or about 2015, Mr. Mitchinson caused Linburn to sell the Interior Icons website and business to DOE 1, or an entity or individuals controlled by or affiliated with DOE 1.

125.    As of the filing of the present Complaint, Herman Miller has not been able to ascertain the identity of DOE 1 or the individuals associated with DOE 1 despite diligent efforts. This is due to DOE 1's deliberate strategy of concealing from the public its true identity, as well as the identities of all individuals affiliated with the company, as discussed further herein below.

4832-1523-1417.4

126.    On information and belief, DOE 1 engaged in a significant restructuring of the Interior Icons business, which included expanding operations to the United States, redesigning the website, and hiring US legal counsel to advise on website content and business practices.

127.    On information and belief, DOE 1 (hereinafter simply referred to as "Interior Icons") re-launched the Interior Icons website sometime in or about mid-2019, and has been selling and advertising infringing products throughout the United States at least since the re-launch.

128.    Herman Miller only recently became aware of the current Interior Icons website.

129.    Interior Icons is now engaged in a dramatic and brazen scheme to undermine Herman Miller's intellectual property rights and trade on the goodwill Herman Miller has developed in some of the most important and iconic furniture designs of all time, including the EAMES® Lounge Chair and Ottoman, the EAMES® Aluminum Group Thin Pad and Soft Pad Chairs, and the Nelson Bubble Lamps.

130.    Interior Icons' counterfeit knock-off copies of the EAMES® Aluminum Group chairs (which Interior Icons refers to as the "EA119" and "EA219") are shown below.





131.    Interior Icons' counterfeits of the EAMES® Lounge Chair and Ottoman (which Interior Icons refers to as "The Lounge Chair" and "The Lounge Ottoman") are shown below.



132.    Interior Icons' counterfeit knock-off copies of the Nelson Bubble Lamp PEAR®
and BALL™ and CRISS CROSS® varieties (which Interior Icons calls by these actual trade names
in its marketing) are shown below.





133.    Interior Icons has also sold counterfeit knock-off copies of other products prominently featured by Herman Miller and Design Within Reach, such as the NOGUCHI® Table (which Interior Icons refers to directly as "Noguchi Table") is shown below.



134.    Interior Icons has also knocked off several other famous third-party designs prominently marketed by Design Within Reach, such as the Barcelona Chair, the Egg Chair, and several designs owned by Knoll, as part of its broader scheme to reproduce as nearly exactly as possible a range of the most iconic furniture designs.

28

135.   It is apparent from Interior Icons' own online customer reviews that even among consumers that are familiar with the original name brands like EAMES®, there is confusion as to whether Interior Icons' counterfeits are actual EAMES® chairs, as opposed to just knock-offs.  For example, with respect to the Interior Icons customer review below, even though Interior Icons did not use the name "Eames" on the webpage for its knock-off "EA-217" chair, the customer readily understood and believed it to be an EAMES® brand chair, and invoked the trademark:



Connie D.   VERIFIED BUYER                                    4/30/2019 12:00:00 AM
★★★★☆

**Your Eames chairs are high ...**
Your Eames chairs are high quality and comfortable. This is the second one I've ordered. I prefer the chair with the higher back.
EA217 - EA217 Office Chair, Black Premium Leather

136.   Interior Icons' "*About*" webpage freely admits that its entire business objective is to try to exactly duplicate "iconic" furniture designs, and then sell them at a lower price point than the "few manufacturers" (*e.g.*, Herman Miller) who otherwise sell the designs.  Though Interior Icons may not mention Herman Miller expressly by name within the main text of its website, it has used the names Herman Miller, Eames, and the name of Herman Miller's wholly-owned retail outlet, Design Within Reach or DWR, including in internet keyword advertising and other targeted internet advertising and in the metadata and other embedded coding for its website, thus confirming that Herman Miller is clearly its primary target.  Interior Icons' business is thus overtly built upon decades' worth of Herman Miller's hard-won good will, and Interior Icons' self-professed disregard for Herman Miller's intellectual property rights.

137.   Indeed, Interior Icons falsely advertises that brand owners (like Herman Miller) have no intellectual property rights, suggesting that any rights in the furniture designs at issue belonged solely to their original designers, and that because those designers are now deceased, the designs have entered into the public domain.  More than that, Interior Icons falsely informs its

users that brands like Herman Miller are somehow improperly manipulating the market in the absence of any rights.

138.   Such express and implied advertising claims are false and defamatory.

139.   Beyond capitalizing on Herman Miller's furniture designs, Interior Icons deliberately mimics the very design and content of Herman Miller's own retail website, using the same fonts, styles, heading types, descriptions, colors, and overall layout, as shown in the example comparisons below.



4832-1523-1417.4



140.    Interior Icons has deliberately and liberally misappropriated to itself Herman Miller's investment in online marketing content and website design. Interior Icons' copying has saved Interior Icons the effort of developing its own original content.

141.    Interior Icons' mimicking of Herman Miller's website is intentionally designed to create – and does create – a strong false impression that Interior Icons is somehow affiliated with or endorsed by Herman Miller.

142.    Upon information and belief, Interior Icons has also purchased internet advertising keywords and online targeted advertising that overtly include "Herman Miller," "Eames," "Design Within Reach" and "DWR" in a deliberate and overt attempt to redirect consumers to Interior Icon's infringing website.

143.    Interior Icons has also engaged in overt infringement of the mark DESIGN WITHIN REACH®.    Interior Icons has maintained a webpage under the URL www.interioricons.com/collections/design-within-reach, displaying the name "DESIGN WITHIN REACH" at the top of the page over a selection of counterfeit designer furniture (including unauthorized copies of designs owned by Herman Miller, Knoll, and others).

144.    Because Design Within Reach sells the same styles of furniture, consumers are easily deceived as to source, sponsorship, or affiliation with Design Within Reach.

145.    After Design Within Reach sent a takedown request to Interior Icons' website host Shopify in February 2020 that resulted in certain offending webpages being taken down, Interior Icons promptly reinstated the webpage at https://interioricons.com/collections/designs-within-reach-of-everyone, now displaying the title at the top of the webpage as "Designs Within Reach Of Everyone."  This is also an infringement.

146.    In infringing upon the DESIGN WITHIN REACH® trademark, Interior Icons' clear deliberate intent is to improperly redirect online traffic and deceive consumers into believing that Interior Icons is somehow affiliated with Design Within Reach (as well as the other protected brands that Interior Icons has copied).

4832-1523-1417.4

147.     For example, Interior Icons' paid Google search results (example shown below) infringe the DESIGN WITHIN REACH® mark, and try to deceive consumers into thinking that Interior Icons is offering furniture sourced from Design Within Reach at "60% off" discount.

Ad   www.interioricons.com/  ▼

## Designs Within Reach For Less | 60% off Sale & Free Shipping

The Iconic **designer** furniture you have always dreamed of. Without the retail markup. Everything in Stock & Ready To Ship. Shop at **Interior Icons** now. Trusted by 2,500+ reviews. Free shipping. 10 yr warranty. Ships in 48h. Types: Chairs, Sofas, Lighting, Tables.

148.     Interior Icons otherwise uses the DESIGN WITHIN REACH® mark in an infringing manner that creates significant confusion, such as with search results like the below:

interioricons.com › collections › design-within-reach-chairs  ▼

## Design Within Reach Chairs | Interior Icons

**Design Within Reach** Chairs. Express shipping Filter Products. Express Shipping. DSW - DSW Chair, White · DSW. $297$89. DSW Chair, White. Ghost - Ghost ...

149.     Design Within Reach is one of only a small handful of retailers authorized to sell genuine Herman Miller, Knoll, Noguchi Museum and other designer furniture.  Because of this, consumers are more apt to believe that Interior Icons has some relationship with Design Within Reach.  Alternatively or additionally, consumers may believe that Interior Icons has entered into some kind of special agreements with the major manufacturers that give Interior Icons the status of a legitimate direct competitor of Design Within Reach in authorized retail sales of designer furniture.  Either way, consumers are likely to be misled into buying from Interior Icons rather than Design Within Reach, causing harm to Design Within Reach.

150.     Design Within Reach has in fact been receiving communications from consumers who are actually confused about the status and relationship of Interior Icons relative to Design Within Reach.

4832-1523-1417.4

151.    Interior Icon's website content – including, for example, its "Terms and Conditions" – plainly implies that Interior Icons engaged US counsel to advise on the lawfulness of its business operations, and thus readily had the ability to investigate the question of infringement and false advertising.

152.    On the "About" webpage of the Interior Icons website, Interior Icons brazenly states that:

> *"To reproduce these furniture icons with the same design and quality specifications as the originals, we purchased all of the original designer pieces. Our skilled artisans, some of whom previously worked for the original manufacturers, studied the originals in great detail, allowing us to reproduce the icons using the same materials and production methods as the original manufacturers. Our processes are completely lawful, as none of the designs we reproduce have any copyright or trademark protection in the U.S."*

153.    Interior Icons thus freely admits that the products it sells are direct, counterfeit copies of furniture designs of other companies (like Herman Miller) and boasts that it may have hired Herman Miller employees to assist in the copying.

154.    Interior Icons also freely admits that those furniture designs are "iconic;" indeed, that is very name of its brand.

155.    Interior Icons' website correctly identifies the EAMES® Aluminum Group Thin Pad design as "***one of the most recognizable office chairs in the world of furniture design***."

156.     As to its EAMES® Aluminum Group Soft Pad knock-off, Interior Icons' website states "***It's a truly timeless piece that has deservedly garnered iconic status***."

34

157.    With respect to the EAMES® Lounge Chair design, Interior Icons states succinctly and in bold all capital letters: "**WORLD'S MOST ICONIC CHAIR**."

158.    By admitting that Herman Miller's designs asserted herein are iconic, Interior Icons has conceded that they are famous and highly recognizable as distinctive designs in the marketplace.

159.    Interior Icons' website also states:  "*The mid-century designer furniture icons that were created over 60 years ago were intended to be accessible to all. Decades after the deaths of the renowned designers, a few influential furniture manufacturers have hoisted prices unnecessarily high, making them available only to the wealthy*."

160.    The preceding statements – along with others on the "About" webpage – contain false and misleading assertions, both express and implied.  Specifically, Interior Icons is falsely conveying the idea that the furniture design rights were controlled by the designers, who somehow deeded them into the public domain upon their deaths.  This is false.  According to the wishes of the designers and their heirs, the designs have always been protected by intellectual property rights whose very purpose is to exclude copyists from the market.  The designers, their families, and their appointed representatives entrusted the care of the designs and the intellectual property to Herman Miller precisely so that Herman Miller could maintain control over the integrity and quality of the products in perpetuity for posterity, and prevent infringement and dilution by companies like Interior Icons, which are principally concerned with short term profit.

161.    Interior Icons' express and implied representations to the consuming public that brands like Herman Miller lack any intellectual property protection and improperly charge high prices are false, defamatory, and injurious to Herman Miller's brand value and reputation.  Such false and misleading statements not only encourage diverting sales to Interior Icons, but generally

embolden other infringers, and spread false information that encourages consumers to purchase knock-offs rather than originals.

162.   Interior Icons' website also states:  "*By creating our products in our own factory, we're able to keep prices low and maintain stringent quality control. Our policy against outsourcing is one of the key reasons we're able to offer a 10-year warranty on every product we offer.*" and "*How We Do It: Iconic mid-century furniture was designed to be accessible to all. Unfortunately, a handful of influential furniture manufacturers inflated prices unnecessarily, making these icons available only to the wealthy. We started Interior Icons as an accessible alternative, cutting out all middlemen and maintaining the same quality standards*."

163.   The preceding statements falsely imply that the reason Interior Icons sells more cheaply than companies like Herman Miller is that Interior Icons "has its own factory" and "cut[s] out all middlemen," as compared with Herman Miller, which must be doing something different. In fact, Herman Miller has its own manufacturing operation in the United States that provides jobs for thousands of people, and does not employ any "middlemen" as implied by Interior Icons.  Upon information and belief, the true reasons that Interior Icons sells more cheaply than Herman Miller are principally related to cheaper labor outside the US, the absence of design costs and inferior quality and quality control.

164.   To the extent that Interior Icons may have recruited any former Herman Miller employees into its scheme (as is suggested by the website), Interior Icons may have engaged in trade secret theft, induced breach of employment agreements, and corporate espionage.

165.   Upon information and belief, Interior Icons was either actually aware, or deliberately chose to disregard, that Herman Miller owns rights in the designs asserted herein.  At a minimum, this is because (a) the Trademark Registrations are publicly available and provide

36

constructive notice as a matter of law; (b) actors like Interior Icons would know to search those records, and (c) Interior Icons purports to have hired US legal counsel that actually advised it on its brazen counterfeiting scheme.

166.   Interior Icons has never contacted or communicated with Herman Miller in any manner, much less to discuss intellectual property rights.  To the contrary, Interior Icons has taken extraordinary steps to conceal its identity.  If Interior Icons had contacted Herman Miller, Herman Miller would have readily explained the nature of its intellectual property rights, and what proposed activities would have been prohibited.  Upon information and belief, Interior Icons did not contact Herman Miller and has taken the extraordinary measures it has to conceal its identity because it already knew that it was engaging in prohibited counterfeiting and infringement.

167.   Upon information and belief, Interior Icons was acutely aware of Herman Miller's ownership of the EAMES® trademark because, when it redesigned the Interior Icons website, it took pains to limit express references on the site to the name "Eames" while at the same time stealthily employing the name in targeted internet advertising, keyword advertising and metadata on its site.

168.   Despite limiting use of the "Eames" name on the webpages themselves, the underlying metadata for the webpages does in fact use the name, as is apparent by web browser tabs revealing that the true name of what Interior Icons calls "The Lounge Chair" is in fact "Eames Lounge Chair Reproduction," as shown below.



169.   Interior Icons' metadata and keywords manifest in internet search engine results that are visible to consumers, such as the one shown below that states "Eames Lounge Chair

Reproduction." This search result came up in Google directly alongside search results for Herman Miller.

**I** interioricons.com › products › the-lounge-the-lounge-chair-black-pre... ▾

Eames Lounge Chair Reproduction, Black Premium Leather ...

★★★★★ Rating: 4.8 - 20 reviews - $1,299.00 - In stock
One of the most iconic **furniture** pieces in the history of interior design, the **Lounge Chair** needs no other introduction. A symbol of the mid-1950s American spirit, ...

170.     The use of the term "reproduction" does not avoid infringement because consumers will likely still be confused that Interior Icons somehow has authorization to sell its counterfeit copies of the EAMES® Lounge Chairs, or that Interior Icons is somehow affiliated with or endorsed by Herman Miller.

171.     Below is another example of one of Interior Icons' ads that comes up in Google alongside search results for genuine Herman Miller products:

**Ad** · www.interioricons.com/ ▾

H. Miller For Less | 70% off Sale | interioricons.com

The Iconic designer furniture you have always dreamed of. Without the retail markup. Everything in Stock & Ready To Ship. Shop at Interior Icons now. Free shipping. Ships in 48h.
Free 30-Day Returns · Charles E. Collection · 2500+ Reviews · Free & Fast Shipping

172.     This ad clearly uses the HERMAN MILLER® ("H. Miller") and EAMES® ("Charles E.") marks, while guiltily attempting (but failing) to circumvent infringement by abbreviating the names.

173.     The ad is also false and deceptive in that it suggests that Interior Icons is offering actual genuine Herman Miller furniture at 70% off pursuant to some kind of sale, rather than simply selling less expensive knock-offs of Interior Icons' own creation.

38

174.    Interior Icons has also used Herman Miller's proprietary unregistered trademarks ALUMINUM GROUP, ALUMINUM GROUP EXECUTIVE CHAIR, and ALUMINUM GROUP SOFT PAD to promote its counterfeit copies of the EAMES® Thin Pad and Soft Pad Executive Chairs.

175.    Initial interest confusion happens when a consumer is directed to Interior Icons' website believing it to be the original source of the product, even if the consumer ultimately appreciates at the point of sale that Interior Icons is selling knock-offs.

176.    Interior Icons' purchase of Herman Miller and Eames-related internet search terms and targeted internet advertising evidences a deliberate intent to cause initial interest confusion.

177.    Post-sale confusion happens when a consumer sees one of Interior Icons' chairs in use and falsely believes it to have originated from the original brand.  Such consumers come away with false and injurious associations about the brand, and may also be prompted to make a purchase of their own from Interior Icons due to their confusion or otherwise.

178.    Confusion is also likely where end users employ agents (such as interior designers) to purchase furniture, and do not appreciate when the agent has supplied a knock-off rather than an original.

179.    Notwithstanding any purported disclaimers, the Interior Icons' website will cause many consumers to believe that either Interior Icons is the original source of the iconic designs that it sells, or that it must have obtained some kind of permission or license from the true source. Other consumers who may understand more fully what Interior Icons is doing are likely to be misled by Interior Icons' express and implied false statements into believing that Herman Miller has no relevant intellectual property rights, or otherwise somehow does not object to Interior Icons' business activities, as if Interior Icons were some kind of Herman Miller outlet store or wholesaler.

180.    Plaintiffs are injured by Interior Icons' misconduct in many ways, including but not limited to the following.

      a.    Loss of sales due to consumer confusion, which could result from any or all of initial interest confusion, point-of-sale confusion, or post-sale confusion.

      b.    Dilution of famous trademark rights.

      c.    Injury to brand value, reputation, and goodwill due to infringement and dilution.

      d.    Loss of sales and injury to brand value, reputation, and goodwill due to false representations about its purported lack of intellectual property rights.

181.    Furthermore, many corporate customers can and do buy sizeable quantities of Herman Miller products at below-retail price from dealers, and Interior Icons' pricing is in many cases on par with commercial dealer pricing, placing it squarely in competition.

182.    Interior Icons has deliberately sought to keep its true identity a secret.  This has included omitting any identifying information on its website (even in purported legal disclosures), registering its internet domain by proxy, avoiding any other forms of public registration (such as a trademark application) that would require disclosing its identity, directing its employees to not identify themselves online as employed by Interior Icons, and generally avoiding commercial activities that would reveal its true identity or the identities of its principals and employees.

183.    Interior Icons' calculated anonymity demonstrates a culpable mindset and dishonest intent.  Interior Icons' secrecy also frustrates any effort by consumers or governmental entities to investigate or bring claims against Interior Icons.  Just so here, where Herman Miller will have to engage in protracted legal procedures to call Interior Icons to court.

184.     On or about January 24, 2020, Interior Icons' website host, Shopify, implemented a partial website takedown at the request of Herman Miller.  This takedown included removal of webpages associated with counterfeit copies of the EAMES® Lounge Chair and Ottoman, EAMES® Aluminum Group Chairs, the NOGUCHI® Table, and the Nelson Bubble Lamps.

185.     However, notwithstanding the partial website takedown, Interior Icons still uses Herman Miller trademarked names in its online advertising, both in underlying metadata, and in a form visible to consumers.

186.     DWR likewise sent a takedown request to Shopify regarding Interior Icons' use of the DESIGN WITHIN REACH® mark on one of its webpages, but no sooner was that webpage taken down, than Interior Icons re-posted it again using the DESIGN WITHIN REACH® trademark, as shown below:



187.     Furthermore, Interior Icons has continued to sell its counterfeits without openly advertising them on its website.

188.     Interior Icons also advertises its counterfeits through other social media online.

4832-1523-1417.4

189.    Interior Icons has demonstrated every intent to continue willfully infringing upon and diluting Herman Miller's and Design Within Reach's intellectual property, and should be enjoined from continuing to do so.

## COUNT I

## COUNTERFEITING UNDER 15 U.S.C. §1114

190.    The preceding paragraphs are incorporated herein by reference.

191.    Herman Miller asserts this claim of trademark and trade dress counterfeiting pursuant to 15 U.S.C. 1114 against Interior Icons and the other DOE Defendants based upon the intentional copying of (a) Herman Miller's protected EAMES® Lounge Chair and Ottoman, (b) Herman Miller's EAMES® Aluminum Group chairs, and (c) Herman Miller's BUBBLE LAMPS® (specifically the PEAR® and CRISS CROSS® designs).

192.    Herman Miller has valid and protectable rights in its Trademark Registrations for the trade dress designs of EAMES® Lounge Chair, the EAMES® Lounge Chair Ottoman, and the EAMES® Aluminum Group frame.

193.    Herman Miller also has valid and protectable rights in its Trademark Registrations for the name EAMES®, HERMAN MILLER®, BUBBLE LAMPS®, PEAR®, and CRISS CROSS®.

194.    By its own admission, Interior Icons has sold, and continues to promote and sell, near exact reproductions of EAMES® Lounge Chair, the EAMES® Lounge Chair Ottoman, and the PEAR® and CRISS CROSS® BUBBLE LAMPS®..

195.    With respect to the EAMES® Aluminum Group, the frames of Interior Icons' knock-offs are essentially the same as what is claimed by Herman Miller's trade dress Registration.

196.    Interior Icons uses the registered trade name EAMES® to advertise the trade dress, with the term showing up prominently in internet search results and on internet search engine tabs,

42

as well as in customer reviews that Interior Icons causes to be displayed alongside the products on the website. The name is also used in advertising keywords, targeted advertising and metadata to redirect Herman Miller customers to Interior Icons' website.

197.    Interior Icons has also used the registered trade name HERMAN MILLER®, which it displays in internet search results. The name is also used in advertising keywords and metadata to redirect Herman Miller customers to Interior Icons' website.

198.    Thus, Interior Icons has thus violated three separate registered trade dresses, and at least five registered trademarks (EAMES®, HERMAN MILLER®, BUBBLE LAMPS®, PEAR®, and CRISS CROSS®) in selling its counterfeits of the EAMES® Lounge Chair and Ottoman, EAMES® Aluminum Group Chairs, and the PEAR® and CRISS CROSS® BUBBLE LAMPS®..

199.    Interior Icons has no license from Herman Miller to engage in the promotion or sale of Herman Miller's designs, or the use of its trademarks.

200.    Interior Icons' counterfeiting is likely to cause point-of-sale confusion, initial interest confusion, and post-sale confusion, resulting in lost sales to Herman Miller, diminution in brand value, and other harms that have been discussed above.

201.    Interior Icons' counterfeiting also dilutes Herman Miller's registered design rights.

202.    Interior Icons' counterfeiting has been deliberate and willful.

203.    Interior Icons copying of Herman Miller's other furniture designs and website exacerbates the likelihood of confusion complained of herein.

204.    Herman Miller is entitled to an injunction to stop the irreparable injuries caused by the counterfeiting complained of herein.

205.    Herman Miller is entitled to elect either treble its actual damages plus attorneys' fees under 15 U.S.C. §1117(b), or statutory damages under 15 U.S.C. §1117(c).

206.    Allowable statutory damages in this case for willful counterfeiting are up to $2,000,000 per registration.

207.    All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

**COUNT II**

**INFRINGEMENT OF REGISTERED HERMAN MILLER**

**TRADE DRESS UNDER 15 U.S.C. §1114**

208.    The preceding paragraphs are incorporated herein by reference.

209.    Herman Miller asserts this claim of registered trade dress infringement pursuant to 15 U.S.C. 1114 against Interior Icons and the other DOE Defendants based upon the intentional copying of Herman Miller's protected EAMES® Lounge Chair and Ottoman trade dress, and Herman Miller's EAMES® Aluminum Group trade dress.

210.    This claim is made in the alternative to Herman Miller's claims of trade dress counterfeiting.

211.    Herman Miller has valid and protectable rights in its Trademark Registrations for the designs of EAMES® Lounge Chair, the EAMES® Lounge Chair Ottoman, and the EAMES® Aluminum Group frame.

212.    By its own admission, Interior Icons has sold, and continues to promote and sell, near exact reproductions of EAMES® Lounge Chair and the EAMES® Lounge Chair Ottoman.

213.    With respect to the EAMES® Aluminum Group, the frames of Interior Icons' knock-offs are essentially the same as what is claimed by Herman Miller's trade dress Registration.

214.     Interior Icons has no license from Herman Miller to engage in the promotion or sale of Herman Miller's designs.

215.     Interior Icons' infringement is likely to cause point-of-sale confusion, initial interest confusion, and post-sale confusion, resulting in lost sales to Herman Miller, diminution in brand value, and other harms that have been discussed above.

216.     Interior Icons' infringement also dilutes Herman Miller's registered design rights.

217.     Interior Icons' infringement has been deliberate and willful.

218.     Interior Icons copying of Herman Miller's other furniture designs and website exacerbates the likelihood of confusion complained of herein.

219.     Herman Miller is entitled to an injunction to stop the irreparable injuries caused by the infringement complained of herein.

220.     Herman Miller is entitled to an award of compensatory damages, and/or equitable damages for unjust enrichment.

221.     Herman Miller is also entitled to enhanced damages and attorneys' fees.

222.     All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

<u>**COUNT III**</u>

<u>**INFRINGEMENT OF HERMAN MILLER TRADE DRESS UNDER 15 U.S.C. §1125(a)**</u>

223.     The preceding paragraphs are incorporated herein by reference.

224.     Herman Miller asserts this claim of infringement of its registered and unregistered trade dress rights pursuant to 15 U.S.C. 1125(a) against Interior Icons and the other DOE Defendants.

225.     As is relevant here, Herman Miller has the following valid and protectable rights:

a.      Trademark Registrations for the designs of EAMES® Lounge Chair, the EAMES® Lounge Chair Ottoman, and the EAMES® Aluminum Group frame.

b.      Unregistered trade dress rights in the configuration of the EAMES® Aluminum Group Thin Pad Executive Chair.  Although the fame and secondary meaning of the entire EAMES® Aluminum Group family inures to the benefit of the Thin Pad Executive Chair, it is only this version of the Aluminum Group unregistered trade dress that is alleged to have been infringed herein.

c.      Unregistered trade dress rights in the configuration of the EAMES® Aluminum Group Soft Pad Executive Chair.  Although the fame and secondary meaning of the entire EAMES® Aluminum Group family inures to the benefit of the Soft Pad Executive Chair, it is only this version of the Aluminum Group unregistered trade dress that is alleged to have been infringed herein.

d.      Unregistered trade dress rights in the Pear, Ball, and Criss Cross Ball versions of the Nelson Bubble Lamps.

226.    Interior Icons has conceded the iconic and distinctive status of all these designs.

227.    Furthermore, the EAMES® Aluminum Group Thin Pad Executive Chair and EAMES® Aluminum Group Soft Pad Executive Chair are famous not only in their own rights, but as part of a family of highly recognizable designs.

228.    Likewise, the Nelson Bubble Pear Lamp, Bubble Ball Lamp, and Crisscross Ball Lamp benefit from the recognition of being part of a well-known family of Nelson Bubble Lamp designs.

229.    By its own admission, Interior Icons has sold, and continues to promote and sell, near exact reproductions of the foregoing products identified in this Claim.

230.     With respect to the EAMES® Aluminum Group, the frames of Interior Icons' knock-offs are essentially the same as what is claimed by Herman Miller's trade dress Registration.

231.     Interior Icons has no license from Herman Miller to engage in the promotion or sale of the foregoing designs.

232.     Interior Icons' infringement is likely to cause point-of-sale confusion, initial interest confusion, and post-sale confusion, resulting in lost sales to Herman Miller, diminution in brand value, and other harms that have been discussed above.

233.     Interior Icons' infringement also dilutes Herman Miller's registered design rights.

234.     Interior Icons' infringement has been deliberate and willful.

235.     Interior Icons copying of Herman Miller's other furniture designs and website exacerbates the likelihood of confusion complained of herein.

236.     Herman Miller is entitled to an injunction to stop the irreparable injuries caused by the infringement complained of herein.

237.     Herman Miller is entitled to an award of compensatory damages, and/or equitable damages for unjust enrichment.

238.     Herman Miller is also entitled to enhanced damages and attorneys' fees.

239.     All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

<u>**COUNT IV**</u>

<u>**TRADEMARK INFRINGEMENT OF HERMAN MILLER MARKS**</u>

<u>**UNDER 15 U.S.C. §1114**</u>

240.     The preceding paragraphs are incorporated herein by reference.

241.     Herman Miller asserts this claim of registered trademark infringement pursuant to 15 U.S.C. 1114 against Interior Icons and the other DOE Defendants based upon Interior Icons'

47

unauthorized use of the registered marks HERMAN MILLER®, EAMES®, BUBBLE LAMPS®, PEAR®, and CRISS CROSS® in connection with their infringing website.

242.   Herman Miller has valid and protectable rights in its Trademark Registrations for the marks HERMAN MILLER®, EAMES®, BUBBLE LAMPS®, PEAR®, and CRISS CROSS®.

243.   Interior Icons has no license from Herman Miller to use the foregoing trademarks.

244.   Interior Icons' infringement – including Interior Icons' use of these trademarks in internet advertising – is likely to cause confusion by misleading customers into believing that Interior Icons is an authorized purveyor of Herman Miller, Eames, and Nelson Bubble Lamp products.  Even if such confusion were dispelled by close review of the website, Interior Icons' advertising is deliberately calculated to cause initial interest confusion and redirect customers.

245.   Aside from Interior Icons' use of Herman Miller's trademarks in a manner that is visible to consumers on its website and in advertisements, Interior Icons also infringes upon the marks by using them as underlying keywords responsive to internet search queries.  Though not visible to consumers, these keywords call up Interior Icons' links and webpages when customers use the keywords as search terms, thereby redirecting customers to Interior Icons when they were actually search for Herman Miller products.  This causes confusion about Interior Icons' relationship to Herman Miller, either in the form of initial interest confusion upon reviewing the search results, or carried through to point of sale confusion if the customer continues to buy a product from Interior Icons under the false impression that they sell genuine Herman Miller products, or are otherwise somehow affiliated with Herman Miller.

246.   Interior Icons' infringement has been deliberate and willful.

48

247.    Interior Icons copying of Herman Miller's other furniture designs and website exacerbates the likelihood of confusion complained of herein.

248.    Herman Miller is entitled to an injunction to stop the irreparable injuries caused by the infringement complained of herein.

249.    Herman Miller is entitled to an award of compensatory damages, and/or equitable damages for unjust enrichment.

250.    Herman Miller is also entitled to enhanced damages and attorneys' fees.

251.    All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

## COUNT V

## TRADEMARK INFRINGEMENT OF DESIGN WITHIN REACH MARKS
## UNDER 15 U.S.C. §1114

252.    The preceding paragraphs are incorporated herein by reference.

253.    Design Within Reach asserts this claim of registered trademark infringement pursuant to 15 U.S.C. 1114 against Interior Icons and the other DOE Defendants based upon Interior Icons' unauthorized use of the registered marks DESIGN WITHIN REACH® and DWR® in connection with Interior Icons' infringing website.

254.    Design Within Reach has valid and protectable rights in its Trademark Registrations for the marks DESIGN WITHIN REACH® and DWR®.

255.    Interior Icons has no license from Design Within Reach to use the foregoing trademarks.

256.    Interior Icons has infringed not only by using the exact tradename "Design Within Reach," but also by using the variant "Designs Within Reach" and "DWR" in a deliberate attempt to improperly confuse and redirect consumers.

49

257.    Interior Icons' infringement – including Interior Icons' use of the trademarks as keywords in internet advertising – is likely to cause confusion by misleading customers into believing that Interior Icons is an authorized purveyor of Design Within Reach products.  Even if such confusion were dispelled by close review of the website, Interior Icons' advertising is deliberately calculated to cause initial interest confusion and redirect customers.

258.    Aside from Interior Icons' use of the DESIGN WITHIN REACH® and DWR® trademarks in a manner that is visible to consumers on its website and in advertisements, Interior Icons also infringes upon the mark by using the marks as underlying keywords responsive to internet search queries.  Though not visible to consumers, these keywords call up Interior Icons' links and webpages when customers use the keywords as search terms, thereby redirecting customers to Interior Icons when they were actually search for Design Within Reach products. This causes confusion about Interior Icons' relationship to Design Within Reach, either in the form of initial interest confusion upon reviewing the search results, or carried through to point of sale confusion if the customer continues to buy a product from Interior Icons under the false impression that they sell genuine Design Within Reach products, or are otherwise somehow affiliated with Design Within Reach.

259.    Interior Icons' infringement has been deliberate and willful.

260.    Interior Icons unlawful copying of furniture designs that are sold by Design Within Reach exacerbates the likelihood of confusion complained of herein.

261.    Design Within Reach is entitled to an injunction to stop the irreparable injuries caused by the infringement complained of herein.

262.    Design Within Reach is entitled to an award of compensatory damages, and/or equitable damages for unjust enrichment.

263.     Design Within Reach is also entitled to enhanced damages and attorneys' fees.

264.     All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

<u>**COUNT VI**</u>

<u>**TRADEMARK INFRINGEMENT UNDER 15 U.S.C. §1125(a)**</u>

265.     The preceding paragraphs are incorporated herein by reference.

266.     Herman Miller asserts this claim of unregistered trademark infringement pursuant to 15 U.S.C. 1125(a) against Interior Icons and the other DOE Defendants based upon Interior Icon's use of the unregistered marks ALUMINUM GROUP, ALUMINUM GROUP EXECUTIVE CHAIR, ALUMINUM GROUP SOFT PAD, and BUBBLE BALL LAMP.

267.     Herman Miller has valid and protectable unregistered trademark rights in the marks ALUMINUM GROUP, ALUMINUM GROUP EXECUTIVE CHAIR, ALUMINUM GROUP SOFT PAD, and BUBBLE BALL LAMP as applied to the kinds of products at issue.

268.     Interior Icons has engaged in the unauthorized use of the foregoing marks in connection with the promotion and sale of counterfeit and infringing products, as described elsewhere herein.

269.     Interior Icons' infringement is likely to cause initial interest confusion, point-of-sale confusion, and post-sale confusion, resulting in lost sales to Herman Miller, diminution in brand value, and other harms that have been discussed above.

270.     Aside from Interior Icons' use of Herman Miller's trademarks in a manner that is visible to consumers on its website and in advertisements, Interior Icons also infringes upon the marks by using them as underlying keywords responsive to internet search queries.  Though not visible to consumers, these keywords call up Interior Icons' links and webpages when customers use the keywords as search terms, thereby redirecting customers to Interior Icons when they were

51

actually search for Herman Miller products.   This causes confusion about Interior Icons' relationship to Herman Miller, either in the form of initial interest confusion upon reviewing the search results, or carried through to point of sale confusion if the customer continues to buy a product from Interior Icons under the false impression that they sell genuine Herman Miller products, or are otherwise somehow affiliated with Herman Miller.

271.     Interior Icons' infringement has been deliberate and willful.

272.     Interior Icons copying of Herman Miller's other furniture designs and website exacerbates the likelihood of confusion complained of herein.

273.     Herman Miller is entitled to an injunction to stop the irreparable injuries caused by the infringement complained of herein.

274.     Herman Miller is entitled to an award of compensatory damages, and/or equitable damages for unjust enrichment.

275.     Herman Miller is also entitled to enhanced damages and attorneys' fees.

276.     All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

## COUNT VII

## TRADE DRESS DILUTION UNDER 15 U.S.C. §1125(c)

277.     The preceding paragraphs are incorporated herein by reference.

278.     Herman Miller asserts this claim of trade dress dilution pursuant to 15 U.S.C. 1125(c) against Interior Icons and the other DOE Defendants based upon the intentional copying of Herman Miller's protected EAMES® Lounge Chair trade dress, and Herman Miller's EAMES® Aluminum Group trade dress.

279.     As is relevant here, Herman Miller has the following valid and protectable rights:

a.     Trademark Registrations for the designs of EAMES® Lounge Chair, the EAMES® Lounge Chair Ottoman, and the EAMES® Aluminum Group frame.

b.     Unregistered trade dress rights in the configuration of the EAMES® Aluminum Group Thin Pad Executive Chair.  Although the fame and secondary meaning of the entire EAMES® Aluminum Group family inures to the benefit of the Thin Pad Executive Chair, it is only this version of the Aluminum Group unregistered trade dress that is asserted in this claim.

c.     Unregistered trade dress rights in the configuration of the EAMES® Aluminum Group Soft Pad Executive Chair.  Although the fame and secondary meaning of the entire EAMES® Aluminum Group family inures to the benefit of the Soft Pad Executive Chair, it is only this version of the Aluminum Group unregistered trade dress that is asserted in this claim.

280.   By its own admission, Interior Icons has sold, and continues to promote and sell, near exact reproductions of the EAMES® Lounge Chair, the EAMES® Aluminum Group Thin Pad Executive Chair, and the EAMES® Aluminum Group Soft Pad Executive Chair and does so by identifying them as EAMES® chairs in advertisements, in keywords, and in metadata on its website.  Even Interior Icons' own customer reviews (which are visible on the website for others to see) refer to the chairs as "Eames" chairs.

281.   With respect to the EAMES® Lounge Chair, the design is protected by a registration.

282.   With respect to the EAMES® Aluminum Group, the frames of Interior Icons' knock-offs are essentially the same as what is claimed by Herman Miller's trade dress registration.

283.    Herman Miller also claims unregistered trade dress rights in the appearance of the EAMES® Aluminum Group Thin Pad Executive Chair, and the EAMES® Aluminum Group Soft Pad Executive Chair.

284.    Interior Icons has no license from Herman Miller to engage in the promotion or sale of Herman Miller's designs.

285.    The registered and unregistered EAMES® Lounge Chair and EAMES® Aluminum Group trade dresses are famous and widely known in the United States.

286.    Interior Icons has admitted that the EAMES® Lounge Chair and the EAMES® Aluminum Group are iconic and famous.

287.    Interior Icons' counterfeiting is likely to cause dilution of the distinctiveness of Herman Miller's valuable designs, and to undermine Herman Miller's ability to control its own brand, even among consumers who know that Interior Icons is selling knock-offs rather than originals.

288.    Interior Icons' counterfeiting is likely to cause dilution of Herman Miller's brand through initial interest confusion, point-of-sale confusion, and post-sale confusion, resulting in lost sales to Herman Miller, diminution in brand value, and other harms that have been discussed above.

289.    Interior Icons has deliberately and willfully created a likelihood of dilution, and caused actual dilution.

290.    Interior Icons copying of Herman Miller's other furniture designs and website exacerbates the likelihood of dilution complained of herein.

291.    Herman Miller is entitled to an injunction to stop the irreparable injuries caused by the dilution and likelihood of dilution complained of herein.

4832-1523-1417.4

292. Herman Miller is entitled to damages in an amount to be proven at trial.

293. All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

## COUNT VIII

## TRADEMARK DILUTION OF "EAMES®" UNDER 15 U.S.C. §1125(c)

294. The preceding paragraphs are incorporated herein by reference.

295. Herman Miller asserts this claim of trademark dilution pursuant to 15 U.S.C. 1125(c) against Interior Icons and the other DOE Defendants based upon the intentional use of Herman Miller's famous EAMES® trademark, and the likely dilution caused thereby.

296. Interior Icons has sold, and continues to promote and sell, near exact reproductions of the EAMES® Lounge Chair, the EAMES® Aluminum Group Thin Pad Executive Chair, and the EAMES® Aluminum Group Soft Pad Executive Chair and does so by identifying them as EAMES® chairs in advertisements, in keywords, and in metadata on its website. Even Interior Icons' own customer reviews (which are visible on the website for others to see) refer to the chairs as "Eames" chairs.

297. Interior Icons has admitted that the EAMES® brand is famous and iconic, which it in fact is.

298. Interior Icons' counterfeiting is likely to cause dilution of the distinctiveness of the EAMES® mark, and to undermine Herman Miller's ability to control its own brand, even among consumers who know that Interior Icons is selling knock-offs rather than originals.

299. Interior Icons' counterfeiting is likely to cause dilution of Herman Miller's brand through initial interest confusion, point-of-sale confusion, and post-sale confusion, resulting in lost sales to Herman Miller, diminution in brand value, and other harms that have been discussed above.

300.    Interior Icons has deliberately and willfully created a likelihood of dilution, and caused actual dilution.

301.    Interior Icons copying of Herman Miller's other furniture designs and website exacerbates the likelihood of dilution complained of herein.

302.    Herman Miller is entitled to an injunction to stop the irreparable injuries caused by the dilution and likelihood of dilution complained of herein.

303.    Herman Miller is entitled to damages in an amount to be proven at trial.

304.    All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

## COUNT IX

## HERMAN MILLER's FALSE ADVERTISING CLAIM UNDER 15 U.S.C. §1125(a)

305.    The preceding paragraphs are incorporated herein by reference.

306.    Herman Miller asserts this claim of false advertising pursuant to 15 U.S.C. 1125(a) against Interior Icons and the other DOE Defendants based upon Interior Icons' false and misleading statements on its website that expressly or implied convey as follows:

a.    That Herman Miller (as one of the clearly implicated "few influential furniture manufacturers" referenced on Interior Icons' "About" webpage) lacks intellectual property rights, and is somehow improperly manipulating the market and pricing in the absence of any rights.

b.    That Herman Miller is acting against the interests and wishes of the original designers.

c.    That Interior Icons and other infringers are otherwise free to engage in counterfeiting because it has somehow been widely accepted or determined (*i.e.*, other than

unilaterally by Interior Icons) that the trade dress and trademarks at issue are in the public domain.

  d. That Interior Icons may be differentiated from Herman Miller because it has its own factory and cuts out middlemen, and that these factors are what make Interior Icons' prices lower than Herman Miller's prices.

  e. In certain internet advertising, suggesting that Interior Icons is in fact a purveyor of genuine Herman Miller and Eames products which are part of a highly discounted "sale" being run by Interior Icons that in fact is a continuous pricing strategy.

307. These express and implied falsehoods have been disseminated in interstate commerce due to Interior Icons' nationwide sales and the national reach of its website.

308. These express and implied falsehoods are likely to deceived consumers, and have the capacity to deceive many more.

309. These express and implied falsehoods are material and injure Herman Miller by diminishing the value of Herman Miller's brand in the eyes of consumers who may now believe that Herman Miller has no intellectual property rights, is acting against the interests of the original designers, and is engaged in some kind of price manipulation related to "outsourcing" and "middlemen."

310. These express and implied falsehoods are also material and injure Herman Miller by encouraging consumers to buy from Interior Icons instead of Herman Miller based on falsehoods (particularly if such customers might have otherwise been wary of infringement concerns), and by inciting other infringers to try to undermine Herman Miller's brand.

311. The advertisement that Interior Icons is offering a "sale" of Herman Miller and Eames products is likely to mislead consumers who see the "sale" ad in isolation and are likely to

57

4832-1523-1417.4

believe that Interior Icons is selling genuine Herman Miller and Eames products, or even that it is licensed to do so.    In this regard, that the "60% Off" and "70% Off" statements are made throughout the website deliberately reinforces the impression that Interior Icons is selling genuine product that is merely "on sale."

312.    Interior Icons' false advertising has been deliberate and willful.

313.    Herman Miller is entitled to an injunction to stop the irreparable injuries caused by the false advertising complained of herein.

314.    Herman Miller is entitled to an award of damages in an amount to be determined at trial.

315.    Herman Miller is also entitled to punitive damages and attorneys' fees.

316.    All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

<u>**COUNT X**</u>

<u>**DESIGN WITHIN REACH's FALSE ADVERTISING CLAIM**</u>

<u>**UNDER 15 U.S.C. §1125(a)**</u>

317.    The preceding paragraphs are incorporated herein by reference.

318.    Design Within Reach asserts this claim of false advertising pursuant to 15 U.S.C. 1125(a) against Interior Icons and the other DOE Defendants based upon Interior Icons' false and misleading statements on its website that expressly or implied convey as follows:

   a.    That Herman Miller and the other of the "few influential furniture manufacturers" referenced on Interior Icons' "About" webpage (referring, for example to Knoll, whose products Design Within Reach also sells) lack intellectual property rights,

and are somehow improperly manipulating the market and pricing in the absence of any rights.

      b.     That the established brands are acting against the interests and wishes of the original designers.

      c.     That Interior Icons and other infringers are otherwise free to engage in counterfeiting because it has somehow been widely accepted or determined (*i.e.*, other than unilaterally by Interior Icons) that the trade dress and trademarks at issue are in the public domain.

      d.     That Interior Icons may be differentiated from existing brands because it has its own factory and cuts out middlemen, and that these factors are what make Interior Icons' prices lower than established brand prices.

      e.     In certain internet advertising, suggesting that Interior Icons is in fact a purveyor of genuine brand products – including Design Within Reach products – which are part of a highly discounted "sale" being run by Interior Icons.

319.    These express and implied falsehoods have been disseminated in interstate commerce due to Interior Icons' nationwide sales and the national reach of its website.

320.    These express and implied falsehoods have almost certainly deceived consumers, and have the capacity to deceive many more.

321.    These express and implied falsehoods are material and injure Design Within Reach by diminishing the value of Design Within Reach's brand in the eyes of consumers who may now believe that Design Within Reach is part of some kind of market price manipulation scheme, and acting against the will of the original designers.

322.    These express and implied falsehoods are also material and injure Design Within Reach by encouraging consumers to buy from Interior Icons instead of Design Within Reach based on falsehoods (particularly if such customers might have otherwise been wary of infringement concerns), and by inciting other infringers to try to undermine the brands that supply Design Within Reach.

323.    Interior Icons' advertisements that it is offering a "sale" of Design Within Reach, Herman Miller, Eames, Knoll, and other products is likely to mislead those who do not know otherwise.  Those seeing the "sale" ad in isolation are likely to believe that Interior Icons is selling actual genuine brand products – including from Design Within Reach – and that it is licensed to do so.  That the "60% Off" and "70% Off" statements are made throughout the website deliberately reinforces the impression that Interior Icons is selling genuine product that is merely "on sale."

324.    Interior Icons' false advertising has been deliberate and willful.

325.    Design Within Reach is entitled to an injunction to stop the irreparable injuries caused by the false advertising complained of herein.

326.    Design Within Reach is entitled to an award of damages in an amount to be determined at trial.

327.    Design Within Reach is also entitled to punitive damages and attorneys' fees.

328.    All of the foregoing allegations of this claim are also made against DOEs 2-10, subject to amendment of this complaint once their identities are known.

## COUNT XI

## UNFAIR COMPETITION UNDER MICHIGAN COMP. LAWS § 445.903

329.    The preceding paragraphs are incorporated herein by reference.

4832-1523-1417.4

330.    Plaintiffs assert this claim of unfair competition pursuant to Michigan Comp. Laws §445.903 against Interior Icons and DOES 2-10,

331.    The same facts that state causes of action under the Lanham Act in the other claims asserted herein also state causes of action under the Michigan Consumer Protection Act, Michigan Comp. Laws §445.903.

332.    Additionally, Interior Icons' use of Plaintiffs' trademarked terms in internet advertising constitutes common law unfair competition, even when those words are not directly visible to consumers when searching the internet.  Interior Icons is unfairly commandeering Plaintiffs' trade names to try to leap-frog Herman Miller and Design Within Reach in the digital marketplace, and to intentionally confuse customers.

333.    Interior Icons' keywords have cause Interior Icons' internet search engine results to become intermingled with results for Herman Miller and Design Within Reach, and have resulted in potential customers getting targeted advertisements for counterfeit products.  The use of Plaintiffs' own trademarks against themselves in this manner constitutes unfair competition.

334.    Interior Icons' and DOEs 2-10's conduct has been willful.

335.    Plaintiffs will continue to suffer irreparable injury absent an injunction.

336.    Plaintiffs seek damages and/or restitution to the extent allowed by the Statute.

## COUNT XII

## COMMON LAW INFRINGEMENT / UNFAIR COMPETITION

337.    The preceding paragraphs are incorporated herein by reference.

338.    All the Plaintiffs assert this claim of common law unfair competition against Interior Icons and DOES 2-10.

4832-1523-1417.4

339.    The same facts that state causes of action under the Lanham Act in the other claims asserted herein also state causes of action under the common law.

340.    Additionally, Interior Icons' use of Plaintiffs' trademarked terms in internet advertising constitutes common law unfair competition, even when those words are not directly visible to consumers when searching the internet.  Interior Icons is unfairly commandeering Plaintiffs' trade names to try to leap-frog Herman Miller and Design Within Reach in the digital marketplace, and to intentionally confuse customers.

341.    Interior Icons' keywords have cause Interior Icons' internet search engine results to become intermingled with results for Herman Miller and Design Within Reach, and have resulted in potential customers getting targeted advertisements for counterfeit products.  The use of Plaintiffs' own trademarks against themselves in this manner constitutes unfair competition.

342.    Interior Icons' and DOEs 2-10's conduct has been willful.

343.    Plaintiffs will continue to suffer irreparable injury absent an injunction.

344.    Plaintiffs seek damages to the full extent allowed under the common law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment as follows:

a)      Finding Defendants liable for infringing and diluting Herman Miller's trade dress and trademark rights – and infringing Design Within Reach's trademark rights – under the Lanham Act, Michigan Law, and common law;

b)      Finding Defendants liable for false advertising and unfair competition under the Lanham Act, Michigan Law, and common law;

c)      Finding that Defendants' foregoing misconduct was willful;

d)      Enjoining Defendants, their agents, representatives, employees, assigns, and suppliers, and all persons acting in concert or privity with them, from engaging in the foregoing misconduct;

e)      Awarding Plaintiffs all damages suffered and expenses incurred because of Defendants' misconduct, along with Defendants' infringing profits;

f)      Awarding Plaintiffs treble damages;

g)      If any of Plaintiffs elect statutory damages, awarding the maximum $2,000,000 per infringed registration;

h)      Declaring that this an exceptional case and awarding Plaintiffs their reasonable attorneys' fees or awarding fees under the MCPA;

i)      Awarding Plaintiffs pre-judgment and post-judgment interest on the damages caused by Defendants' misconduct; and

j)      Granting Plaintiffs such other and further relief as the Court may deem just and proper under the circumstances.

4832-1523-1417.4

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, Herman Miller requests a trial by jury of any issues so triable by right.

Dated:  April 9, 2020                    Respectfully submitted,

By:   */s/ Irina Kashcheyeva*

Irina N. Kashcheyeva
FOLEY & LARDNER LLP
500 Woodward Avenue
Suite 2700
Detroit, MI 48226-3489
Telephone: 303.234.7100
ikashcheyeva@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Telephone: 212.682.7474
Email: jmoskin@foley.com

Jean-Paul Ciardullo
FOLEY & LARDNER LLP
555 S. Flower St., Suite 3300
Los Angeles, CA 90071
Telephone: 213.972.4500
Email: jciardullo@foley.com

*Attorneys for Plaintiffs*
*HERMAN MILLER, INC. and*
*DESIGN WITHIN REACH, INC.*

4832-1523-1417.4